**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA<br>U.S. Department of Justice<br>Antitrust Division, Litigation I Section<br>450 Fifth Street, NW, Suite 4100<br>Washington, DC 20530,<br><br>                *Plaintiff*,<br>    v.<br><br>INTERNATIONAL PAPER COMPANY<br>6400 Poplar Avenue,<br>Memphis, TN 38197, and<br><br>TEMPLE-INLAND INC.<br>1300 MoPac Expressway South, Third Floor<br>Austin, TX 78746,<br><br>                *Defendants.* |

**COMPLAINT**

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin International Paper Company ("International Paper") from acquiring Temple-Inland Inc. ("Temple-Inland"). Plaintiff alleges as follows:

**I.  NATURE OF THE ACTION**

1.  On September 6, 2011, International Paper agreed to acquire Temple-Inland in a transaction valued at $4.3 billion. International Paper and Temple-Inland are, respectively, the largest and third-largest producers of containerboard in the United States and Canada (which the paper industry and this Complaint refer to collectively as "North America"). Containerboard is the paper that is used to make corrugated boxes.

2. The proposed merger would increase International Paper's share of the containerboard capacity in North America from approximately 26 to 37 percent. After the merger, the combined firm would likely reduce containerboard output, raising containerboard prices throughout North America. International Paper would also likely accommodate its large rivals' efforts to raise containerboard prices by reducing their own output, making such price increases more likely. These higher containerboard prices would, in turn, raise the prices of corrugated boxes.

3. Because International Paper's proposed merger with Temple-Inland is likely to substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, the Court should permanently enjoin this merger.

## II.  JURISDICTION, VENUE, AND INTERSTATE COMMERCE

4. The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, seeking injunctive and other equitable relief from the defendants' violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

5. International Paper and Temple-Inland sell containerboard, corrugated boxes, and other industrial products throughout the United States. They engage in interstate commerce and in activities substantially affecting interstate commerce.

6. The Court has subject-matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C. § 25; and 28 U.S.C. §§ 1331, 1337(a), and 1345.

7. Defendants have consented to personal jurisdiction in this District. The Court also has personal jurisdiction over the defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22.

8. Defendants have consented to venue in this District.  Venue is also proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391.

### III.  DEFENDANTS AND THE TRANSACTION

9. International Paper is a corporation organized and existing under the laws of the State of New York, with its headquarters in Memphis, Tennessee.  International Paper owns and operates 12 containerboard mills and 133 plants that convert containerboard into corrugated boxes ("box plants") in the United States.  In 2010, International Paper's annual revenues were approximately $25.2 billion, with its North American Industrial Packaging Group, which produces containerboard and corrugated products, accounting for $8.4 billion.

10. Temple-Inland is a corporation organized and existing under the laws of the State of Delaware, with its headquarters in Austin, Texas.  Temple-Inland owns and operates seven containerboard mills and 53 box plants in the United States.  In 2010, Temple-Inland's annual revenues were approximately $3.8 billion, with its corrugated-packaging business accounting for $3.2 billion.

### IV.  THE RELEVANT MARKET

**A.  Relevant Product Market: Containerboard**

11. The relevant product market for analyzing the likely effects of the proposed merger is containerboard.  There are two types of containerboard: (1) linerboard, the paper that forms the inner and outer facings of a corrugated sheet; and (2) medium, the paper that is inserted between the inner and outer linerboards in a wavy, fluted pattern.  Linerboard is made from virgin wood fiber, recycled fiber (usually "old corrugated containers," or "OCC"), or a combination of both virgin and recycled fibers.  Medium is typically made from recycled fiber, but can also be made from virgin fibers or a combination of recycled and virgin fibers.

12. Linerboard and medium are relatively undifferentiated products. The linerboard made by one North American producer is substantially the same as the linerboard made by other producers. The medium made by the various producers is also substantially the same.

13. Although linerboard and medium are typically produced on different machines and have different performance characteristics, it is appropriate to view them as a single relevant product market because (1) containerboard producers and their customers generally regard competition in terms of a single containerboard market, not separate markets for linerboard and medium, and (2) analyzing them as separate products would not significantly alter the market shares or the analysis of the proposed merger's competitive effects.

14. Producers manufacture containerboard at mills and then ship it to box plants. At box plants, a large machine called a corrugator combines the linerboard and medium into rigid corrugated sheets. Box plants then convert the sheets into corrugated packaging, including corrugated boxes and displays. The work performed at box plants is sometimes divided between separate facilities called sheet feeders (which combine linerboard and medium into corrugated sheets) and sheet plants (which convert the sheets into corrugated boxes). Containerboard typically is the largest cost component of a corrugated box, accounting for a majority of the price.

15. For box manufacturers, there is no reasonable substitute for containerboard: boxes made from other types of paper lack the required performance characteristics, such as the necessary strength, basis weight, and thickness. Furthermore, for box customers, there is no reasonable substitute for corrugated boxes: other products used to carry and transport goods, such as returnable plastic containers, are typically too expensive or lack the required performance characteristics to serve as a commercially viable alternative.

16. Consequently, a small but significant increase in the price of containerboard in North America is unlikely to cause a sufficient number of containerboard or corrugated box customers to switch to other types of products such that the price increase would be unprofitable. Therefore, containerboard is a relevant product market and a "line of commerce" within the meaning of Section 7 of the Clayton Act.

### B. Relevant Geographic Market: North America

17. The relevant geographic market for analyzing the likely effects of the proposed merger on the production and sale of containerboard is North America.

18. Containerboard produced outside of North America is not a commercially viable substitute for containerboard produced in North America due to higher transportation costs, volatile and unfavorable currency exchange rates, lower-quality fiber, and other disadvantages. Because of these disadvantages, containerboard produced outside of North America accounts for less than one percent of the containerboard sold in North America.

19. Consequently, a small but significant increase in the price of containerboard in North America is unlikely to cause a sufficient number of customers of containerboard or corrugated boxes to switch to containerboard produced outside of North America to make the price increase unprofitable. Therefore, North America is a relevant geographic market and a "section of the country" within the meaning of Section 7 of the Clayton Act for the production and sale of containerboard.

### V. LIKELY ANTICOMPETITIVE EFFECTS

20. The proposed merger would likely substantially lessen competition in the production and sale of containerboard in North America. International Paper controls approximately 26 percent of North American containerboard capacity, and Temple-Inland

controls approximately 11 percent. Thus, as alleged in paragraph 2, the proposed merger would give International Paper control over approximately 37 percent of North American containerboard capacity. Post-merger, the four largest producers would control approximately 74 percent of that capacity. A number of smaller producers, none with a share higher than three percent, account for the remainder of the market.

21. Using a standard concentration measure called the Herfindahl–Hirschman Index (or "HHI," defined and explained in Appendix A), the proposed merger would significantly raise market concentration and result in a moderately concentrated market, producing an HHI increase of approximately 605 and a post-merger HHI of approximately 2,025. The defendants' combined market share (approximately 37 percent), coupled with the significant increase in market concentration (605), exceed the levels that courts have found to create a presumption that a proposed merger likely would substantially lessen competition.

22. The proposed merger is likely to cause International Paper to engage in unilateral conduct that would raise the market price of containerboard. In the containerboard industry, there is a close relationship between the market price and industry output. All else equal, when industry output grows, the market price of containerboard falls, and as industry output shrinks, the market price of containerboard rises. Because of this close relationship, a containerboard producer can raise the market price of containerboard by strategically reducing output, for example, by idling containerboard machines or closing mills. When a producer significantly reduces output, it loses profits on the output that it removed, but it gains profits (from the resulting higher price) on the output that remains.

23. A producer's willingness to raise the market price by reducing output depends on its size: as a producer grows larger, it is more likely to profit from strategically reducing output

because it will have more sales at the higher price to offset the lost sales on the reduced output. In contrast, a small producer is unlikely to profit from reducing output because it will not have sufficient remaining sales at the higher price, making the reduction unprofitable.

24. By combining the containerboard capacity of International Paper and Temple-Inland, the proposed merger would significantly expand the volume of containerboard over which International Paper would benefit from a price increase. With that additional volume, International Paper would likely find it profitable to strategically reduce containerboard output, for example, by idling containerboard machines or closing mills. As described generally in paragraphs 22–23, although International Paper would lose profits on the output that it removed, it would gain even greater profits on the output that remains.

25. The proposed merger would also likely cause International Paper to engage in parallel accommodating conduct. Due to its additional containerboard volume obtained as a result of the merger, International Paper would benefit more from a price increase after the proposed merger. Thus, if a large rival attempted to raise the market price by reducing output, International Paper would likely accommodate its rival's actions by reducing or not increasing its own output. The rival would thus be likely to increase the market price by reducing output after International Paper and Temple-Inland complete the proposed merger.

## VI.  ABSENCE OF COUNTERVAILING FACTORS

26. Supply responses from competitors or potential competitors will not prevent the likely anticompetitive effects of the proposed merger. Virtually all existing North American containerboard producers are capacity-constrained and have other operational limitations that would prevent them from significantly expanding output using their existing machines in response to a post-merger increase in the price of containerboard. North American producers are

also unlikely to respond to a domestic price increase by diverting a significant amount of their containerboard exports to the North American market.

27. Entry and expansion in the containerboard market through the construction of new containerboard mills or machines also are unlikely to occur in a timely manner or on a scale sufficient to undo the competitive harm that the proposed merger would produce. New entry typically requires investing hundreds of millions of dollars in equipment and facilities, obtaining extensive environmental permits, and establishing a reliable distribution system. Competitors are unlikely to build new containerboard mills or install new containerboard machines in response to a small but significant price increase, or do so quickly enough to defeat one.

28. Defendants cannot demonstrate cognizable, merger-specific efficiencies that are sufficient to reverse the proposed merger's anticompetitive effects.

## VII. VIOLATION ALLEGED

29. The United States hereby incorporates paragraphs 1 through 28.

30. International Paper's proposed merger with Temple-Inland would likely substantially lessen competition in the market for containerboard, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

31. Unless enjoined, the proposed merger would likely have the following effects, among others:

    a. competition between International Paper and Temple-Inland for the sale of containerboard would be eliminated;

    b. competition generally in the sale of containerboard in North America would likely be substantially lessened; and

    c.    prices for containerboard in North America would likely increase to levels above those that would prevail absent the proposed merger.

## VIII.  REQUESTED RELIEF

32.    Plaintiff requests that this Court:

    a.    adjudge and decree that the proposed merger violates Section 7 of the Clayton Act, 15 U.S.C. § 18;

    b.    preliminarily and permanently enjoin the defendants from carrying out the proposed merger or from entering into or carrying out any other agreement, understanding, or plan, the effect of which would be to bring the containerboard business of International Paper and Temple-Inland under common ownership or control;

    c.    award plaintiff its costs in this action; and

    d.    award plaintiff such other relief as may be just and proper.

Dated:  February 10, 2012

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

| | |
|---|---|
|   /s/ Sharis A. Pozen<br>Sharis A. Pozen (D.C. Bar #446732)<br>Acting Assistant Attorney General |   /s/ David C. Kelly<br>David C. Kelly*<br>Andrea V. Arias (D.C. Bar #1004270)<br>Lawrence E. Buterman (D.C. Bar #998738)<br>Justin M. Dempsey (D.C. Bar #425976) |
|   /s/ Leslie C. Overton<br>Leslie C. Overton (D.C. Bar #454493)<br>Deputy Assistant Attorney General | Lauren I. Dubick<br>Scott I. Fitzgerald<br>Mitchell H. Glende<br>Ryan M. Kantor<br>Karl D. Knutsen |
|   /s/ Patricia A. Brink<br>Patricia A. Brink<br>Director of Civil Enforcement | John P. Lohrer (D.C. Bar #438939)<br>Richard S. Martin<br>Natalie A. Rosenfelt<br>Michelle R. Seltzer (D.C. Bar #475482)<br>Julie A. Tenney |
|   /s/ Joshua H. Soven<br>Joshua H. Soven (D.C. Bar #436633)<br>Chief, Litigation I Section | Kevin Yeh<br><br>Attorneys<br>U.S. Department of Justice<br>Antitrust Division |
|   /s/ Peter J. Mucchetti<br>Peter J. Mucchetti (D.C. Bar #463202)<br>Assistant Chief, Litigation I Section | Litigation I Section<br>450 Fifth Street, NW, Suite 4100<br>Washington, DC  20530<br>Tel.: (202) 353-4211<br>Fax: (202) 307-5802 |
| | *Attorney of Record |

# APPENDIX A

## *Herfindahl–Hirschman Index*

The term "HHI" means the Herfindahl–Hirschman Index, a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI takes into account the relative size distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1,500 and 2,500 points are considered to be moderately concentrated, and markets in which the HHI is in excess of 2,500 points are considered to be highly concentrated. *See* U.S. Department of Justice & FTC, *Horizontal Merger Guidelines* § 5.3 (2010). Transactions that increase the HHI by more than 200 points in highly concentrated markets presumptively raise antitrust concerns under the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission. *See id.*